**FILED**

**Apr 29, 2024**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BRADLEY J. MCCLUNG    CDCR#: BU-8378
Name and Prisoner/Booking Number

California Medical Facility
Place of Confinement

P.O. Box 2500
Mailing Address

Vacaville, CA 95696-2500
City, State, Zip Code

**(Failure to notify the Court of your change of address may result in dismissal of this action.)**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

BRADLEY JAMES MCCLUNG,
(Full Name of Plaintiff)
                Plaintiff,

        v.

(1) PLACER COUNTY
(Full Name of Defendant)

(2) et al.

(3)

(4)
                Defendant(s).

☒ Check if there are additional Defendants and attach page 1-A listing them.

JURY TRIAL DEMANDED

CASE NO. 2:22-cv-01740 TLN DB P
        (To be supplied by the Clerk)

**CIVIL RIGHTS COMPLAINT
BY A PRISONER**

☐ Original Complaint
☐ First Amended Complaint
☐ Second Amended Complaint
☒ Third Amended Complaint

## A. JURISDICTION

1.  This Court has jurisdiction over this action pursuant to:
    ☒ 28 U.S.C. § 1343(a); 42 U.S.C. § 1983
    ☐ 28 U.S.C. § 1331; Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971).
    ☐ Other: _____.

2.  Institution/city where violation occurred: South Placer Jail / Roseville, CA.

1  *LIST OF DEFENDANTS:*

2  (1)  PLACER COUNTY,

3  (2)  Doe 1,

4  (3)  Doe 2,

5  (4)  Doe 3,

6  (5)  Doe 4,

7  (6)  Doe 5,

8  (7)  Doe 6,

9  (8)  Doe 7,

10  (9)  Doe 8,

11  (10)  Doe 9,

12  (11)  Doe 10,

13  (12)  Doe 11,

14  (13)  Doe 12,

15  (14)  Doe 13,

16  (15)  SHERIFF DEVON BELL,

17  (16)  CAPTAIN DAVID POWERS,

18  (17)  DOE 14,

19  (18)  DOE 15,

20  (19)  DOE 16,

21  (20)  DOE 17,

22  (21)  DOE 18,

23  (22)  DOE 19,

24  (23)  DOE 20,

25  (24)  DOE 21,

26  (25)  DOE 22,

27  (26)  DOE 23,

28  (27)  DOE 24,

29  (28)  DOE 25,

(29)  DOE 26,

(30)  DOE 27,

(31)  DOE 28,

(32)  DOE 29,

(33)  DOE 30,

(34)  DOE 31,

(35)  DOE 32,

(36)  DOE 33,

(37)  DOE 34,

(38)  DOE 35,

(39)  DOE 36,

(40)  DOE 37.

No. 2:22-cv-01740 TLN DB P       **PAGE 1-A**       (THIRD AMENDED COMPLAINT)
MCCLUNG v. CA. BOARD of STATE and COMMUNITY CORRECTIONS, et al.

## B. DEFENDANTS

1.  Name of first Defendant: _See pgs. 2-A through 2-E_. The first Defendant is employed as:
    _____ at _____.
                (Position and Title)                                  (Institution)

2.  Name of second Defendant: _____. The second Defendant is employed as:
    _____ at _____.
                (Position and Title)                                  (Institution)

3.  Name of third Defendant: _____. The third Defendant is employed as:
    _____ at _____.
                (Position and Title)                                  (Institution)

4.  Name of fourth Defendant: _____. The fourth Defendant is employed as:
    _____ at _____.
                (Position and Title)                                  (Institution)

**If you name more than four Defendants, answer the questions listed above for each additional Defendant on a separate page.**

## C. PREVIOUS LAWSUITS

1.  Have you filed any other lawsuits while you were a prisoner?   ☒ Yes   ☐ No

2.  If yes, how many lawsuits have you filed? _10_ . Describe the previous lawsuits:

    a.  First prior lawsuit:  Attached, pgs. 2-F through 2-H.
        1.  Parties: _____ v. _____
        2.  Court and case number: _____.
        3.  Result: (Was the case dismissed?  Was it appealed?  Is it still pending?)_____
            _____.

    b.  Second prior lawsuit:
        1.  Parties: _____ v. _____
        2.  Court and case number: _____.
        3.  Result: (Was the case dismissed?  Was it appealed?  Is it still pending?)_____
            _____.

    c.  Third prior lawsuit:
        1.  Parties: _____ v. _____
        2.  Court and case number: _____.
        3.  Result: (Was the case dismissed?  Was it appealed?  Is it still pending?)_____
            _____.

**If you filed more than three lawsuits, answer the questions listed above for each additional lawsuit on a separate page.**

## B. DEFENDANTS

**1.** Name of **first defendant:** PLACER COUNTY ("**COUNTY**") is and was a municipal organization existing under the laws of the State of California. COUNTY is a chartered subdivision of the State of California with the capacity to be sued. COUNTY is responsible for the actions, omissions, policies, procedures, practices and customs of its various agents and agencies, including the Placer County Sheriff's Office (**"PCSO"**), as well as the hiring, training, supervision, control and discipline of its agents, Deputy Sheriffs, Officers, and Jailors. At all relevant times, Defendant COUNTY was responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of the COUNTY and its employees and agents complied with the laws of the United States and the State of California.  At all relevant times, COUNTY was responsible for the operation, practices, and totality of conditions of its jail facilities: the South Placer Jail (**"SPJ"**) and Placer County Jail (**"PCJ"**). At all relevant times, COUNTY was the employer of Defendant DOES 14-30.

**2.** The COUNTY acts or fails to act through its policy-making officials, including, but not limited to its County Board Members, the Chairperson of the County Board, Special Committees, County Health Officer, County Sheriff, and Jail Superintendent. The acts and edicts of these policy-making officials also represent the policies, practices, and customs of the COUNTY.

**3.** Names of **second through fourteenth defendants:** DOES 1-13. The second through fourteenth Defendants are the California Board of State and Community Corrections (**"BSCC"**) Board Members, as defined in California Penal Code (**"PC"**) § 6025(b). DOES 1-13 (hereafter "**DOE BSCC**") are policy-making officials responsible for establishing, or failing to establish, policies, practices, and regulations of COUNTY'S jails by virtue of PC § 6035. Defendants DOE BSCC are constitutionally and statutorily responsible for the operation, practices, and totality of conditions of COUNTY's jail facilities. Defendant DOE BSCC at all times herein were acting under color of law in such capacity as

1  leaders, policy-makers, auditors, and regulators for COUNTY. DOE BSCC are
2  sued individually and in their official capacities.

3    **4.** Defendant DOE BSCC have constitutional and statutory responsibility for
4  the conditions and practices of COUNTY's jails by virtue of PC § 6024 *et seq.*
5  *and* especially § 6024(b). Defendant DOE BSCC are responsible for the
6  minimum standards of COUNTY's jail facilities in conformity with constitutional
7  requisites. Defendant DOE BSCC are responsible for the establishment of, or
8  failure to establish, standards for COUNTY jail detainees' health and sanitation,
9  fire and life safety, security, rehabilitation programs, recreation, and treatment
10  by virtue of PC § 6030. Furthermore, Defendant BSCC Board Members are
11  responsible for inspecting COUNTY's jail facilities, by virtue of PC § 6031, and to
12  report substandard conditions to the state legislature.

13    **5.** Name of **fifteenth defendant:** SHERIFF DEVON BELL. Defendant SHERIFF
14  DEVON BELL (hereafter "**SHERIFF**"), is and was the Sheriff for COUNTY, and in
15  that capacity, is and was responsible for establishing or failing to establish
16  policies, practices, and regulations for the conduct of PCSO and its employees.
17  Defendant COUNTY SHERIFF is and was responsible for the hiring, training,
18  supervision, discipline, and control of all members of PCSO. Defendant
19  COUNTY SHERIFF is and was the commanding officer of the other sheriff and jail
20  personnel named herein as individual defendants. Defendant COUNTY SHERIFF
21  is and was constitutionally and statutorily responsible for the operation,
22  practices, policies, and totality of conditions of COUNTY's jail facilities.
23  Defendant COUNTY SHERIFF, at all times herein, was acting under color of law
24  in such capacity as the agent, servant, and employee of COUNTY. He is sued
25  individually and in his official capacity.

26    **6.** Defendant COUNTY SHERIFF has a constitutional and statutory
27  responsibility for the conditions and practices of COUNTY's jail facilities, and
28  Defendant COUNTY SHERIFF is responsible for maintaining those jail facilities in
29  conformity with constitutional requisites. Defendant COUNTY SHERIFF is also the

1 custodian of the jail facility by virtue of California PC § 4000 *et seq.*, responsible
2 for the neglect and omission of the duties of all deputy sheriffs, officers, and
3 jailors by virtue of Cal. Gov't Code §§ 26600–26617, and charged with
4 appropriate and humane care of people detained in the county jail facilities,
5 by virtue of the California Code of Regulations, Title 15 ("15 CCR"), §§ 1000–
6 1282. In addition, defendant COUNTY SHERIFF is and was responsible for
7 ensuring that Deputy Sheriffs, Officers, and Jailors of COUNTY obey the
8 regulations of PCSO, the ordinances and laws of COUNTY, and the laws and
9 Constitutions of the State of California and the United States. Defendant
10 COUNTY SHERIFF is and was responsible also for the establishment of policies,
11 procedures, and guidelines for the arrest, jailing, and safekeeping of pretrial
12 detainees housed in COUNTY's jail facilities.

13   **7.** Name of **sixteenth defendant:** DAVID POWERS. Defendant Captain DAVID
14 POWERS ("**POWERS**") is and was, at all times relevant, Chief Jailor and Jail
15 Superintendent of PCSO, and in that capacity is and was constitutionally and
16 statutorily responsible also for the training, supervision, discipline, and control of
17 all Deputy Jailors and Officers, as well as the operation, practices, and totality
18 of conditions of the SPJ, and PCJ, facilities. Defendant POWERS has statutory
19 responsibility also for ensuring that COUNTY's Jail facilities conform to the
20 requirements of California law, and the laws and Constitution of the United
21 States. In addition, defendant POWERS is and was responsible for the
22 establishment of policies, procedures, and guidelines for the arrest, jailing, and
23 safekeeping of pretrial detainees housed in COUNTY's Jail facilities. Defendant
24 POWERS, at all times herein, was acting under color of law in such capacity as
25 the agent servant and employee of COUNTY and acted with the complete
26 authority and ratification of his principal, Defendant COUNTY. POWERS is sued
27 individually and in his official capacity.

28   **8.** Names of **seventeenth through twenty-eighth defendants:** DOES 14-25
29 (hereafter "**DOE SUPERVISORS**") are managerial, supervisorial, and policy-

No. 2:22-cv-01740 TLN DB P      **PAGE 2-C**    (THIRD AMENDED COMPLAINT)
MCCLUNG v. CA. BOARD of STATE and COMMUNITY CORRECTIONS, et al.

1 making employees of, and for, the PCSO, who were acting under color of law
2 within the course and scope of their duties as managerial, supervisorial, and
3 policy-making employees for the COUNTY. DOE SUPERVISORS include, but are
4 not limited to, the Lieutenants, Sergeants, Office Managers, and/or Board of
5 Supervisors members responsible in any way for the administration, policy-
6 making, management, or operation of COUNTY's jails. DOE SUPERVISORS were
7 acting with the complete authority and ratification of their principal,
8 Defendant COUNTY.

9    **9.** Names of **twenty-ninth through fortieth defendants:** DOES 26-37 (**"DOE**
10 **OFFICERS"**) are sheriff's deputies and/or correctional officers for PCSO, and
11 employed by COUNTY at SPJ, PCJ, or both. DOE OFFICERS were acting under
12 color of law within the course and scope of their duties sheriff's deputies
13 and/or correctional officers for the COUNTY. DOES 19-30 were acting with the
14 complete authority and ratification of their principal, Defendant COUNTY.

15   **10.** On information and belief SHERIFF, POWERS, DOE OFFICERS, and DOE
16 SUPERVISORS were residents of the County of Placer, California.

17   **11.** In doing the acts and failing and omitting to act as hereinafter described,
18 Defendants DOE OFFICERS acted on the implied and actual permission and
19 consent of Defendants DOE BSCC, COUNTY, SHERIFF, POWERS, and DOE
20 SUPERVISORS.

21   **12.** The true names and capacities, whether individual, corporate, association
22 or otherwise of Defendants DOES 1-30, inclusive, are unknown to PLAINTIFF, who
23 otherwise sues these defendants by such fictitious names. PLAINTIFF will seek
24 leave to amend this complaint to show the true names and capacity of these
25 defendants when they have been ascertained. Each of the fictitiously named
26 defendants is responsible in some manner for the conduct or liabilities alleged
27 herein.

28   **13.** At all times mentioned herein, each and every defendant was the agent
29 of each and every other defendant and had the legal duty to oversee and

1 supervise the hiring, conduct, and/or employment of each and every
2 defendant.

3   **14.** All of the acts complained of herein by Plaintiff against Defendants were
4 done and performed by said Defendants by and through their authorized
5 agents, servants, and/or employees, all of whom at all relevant times herein
6 were acting within the course, purpose, and scope of said agency, service,
7 and/or employment capacity. Moreover, Defendants and their agents ratified
8 all of the acts complained of herein.

9   **15.** DOES 1-37 are sued in their individual capacities.

## C. PREVIOUS LAWSUITS

a. First prior lawsuit:

   1. Parties:   Bradley J. McClung v. Placer County Sheriff's Office.

   2. Court and case number:   Placer Co. Superior Court,

                      62-184146/62-184544/62-185347.

   3. Result:   Petition denied.

b. Second prior lawsuit:

   1. Parties:   Bradley J. McClung v. Placer County Sheriff's Office.

   2. Court and case number:   Placer Co. Superior Court,

                      62-184146/62-184544/62-185347.

   3. Result:   Petition denied.

c. Third prior lawsuit:

   1. Parties:   Bradley J. McClung v. Superior Court of California, County of
                Placer

   2. Court and case number:   Placer Co. Superior Court, 62-185347.

   3. Result:   Petition denied.

d. Fourth prior lawsuit:

   1. Parties:   Bradley J. McClung v. Placer County Sheriff's Office

   2. Court and case number:   Placer Co. Superior Court,

                      WHC-001801.

   3. Result:   Petition denied on the merits.

e. Fifth prior lawsuit:

   1. Parties:   Bradley J. McClung v. Placer County Sheriff's Office, Wellpath.

   2. Court and case number:   Placer Co. Superior Court,

                      62-185347/62-184146/62-184544.

   3. Result:   Petition denied.

f. Sixth prior lawsuit:

   1. Parties:   Bradley J. McClung v. Devon Bell, Sheriff, Placer County.

2. Court and case number:    Placer Co. Superior Court,

62-184544/62-184146/62-185347.

3. Result:    Petition denied.

g. Seventh prior lawsuit:

1. Parties:    In re Bradley James McClung

2. Court and case number:    Court of Appeal of the State of California, Third

Appellate District,

C096843.

3. Result:    Summarily denied.

h. Eighth prior lawsuit:

1. Parties:    Bradley J. McClung v. Superior Court of California, County of

Placer

2. Court and case number:    Placer Co. Superior Court,

62-185347/62-184544/62-184146.

3. Result:    Petition denied.

i. Ninth prior lawsuit:

1. Parties:    The People of the State of California v. Bradley James McClung

2. Court and case number:    Court of Appeal of the State of California,

Third Appellate District,

C097590.

3. Result:    Petition denied without prejudice of making request to trial

court.

j. Tenth prior lawsuit:

1. Parties:    The People of the State of California v. Bradley James McClung

2. Court and case number:    Court of Appeal of the State of California,

Third Appellate District,

C097590.

3. Result:    Motion to recall the remittitur denied.

k. Eleventh prior lawsuit:

    1.  Parties:   Bradley James McClung v. Third District Court of Appeal

    2.  Court and case number:   Supreme Court of California,

                                   S283873.

    3. Result:   Pending.

## D.  CAUSE OF ACTION

### CLAIM I

1.  State the constitutional or other federal civil right that was violated: _____
     Attached, pgs. 3-A through 3-I .

2.  **Claim I**.  Identify the issue involved.  Check **only one**.  State additional issues in separate claims.
    - ☐ Basic necessities
    - ☐ Mail
    - ☐ Access to the court
    - ☐ Medical care
    - ☐ Disciplinary proceedings
    - ☐ Property
    - ☐ Exercise of religion
    - ☐ Retaliation
    - ☐ Excessive force by an officer
    - ☐ Threat to safety
    - ☒ Other: Amount of daily cell confinement.

3.  **Supporting Facts.**  State as briefly as possible the FACTS supporting Claim I.  Describe exactly what **each Defendant** did or did not do that violated your rights.  State the facts clearly in your own words without citing legal authority or arguments.
    Attached, pgs. 3-A through 3-I

4.  **Injury.**  State how you were injured by the actions or inactions of the Defendant(s).
    Deprivation of rights, loss of liberties otherwise enjoyed by pretrial detainees, deprivation of privileges, infliction of punishment, and physical pain and discomfort. Separately, mental and emotional harm: Cognitive impairment, emotional distress.
    See also pg. 3-I

5.  **Administrative Remedies:**
    a.  Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?  ☒ Yes  ☐ No
    b.  Did you submit a request for administrative relief on Claim I?  ☒ Yes  ☐ No
    c.  Did you appeal your request for relief on Claim I to the highest level?  ☒ Yes  ☐ No
    d.  If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

3

## D. CAUSE OF ACTION

## FACTS COMMON TO ALL CLAIMS

**16.** At all relevant times Petitioner, BRADLEY JAMES MCCLUNG ("**PLAINTIFF**"), was a U.S. citizen, and resident of Placer County, California.

**17.** On 8 May 2022, PETITIONER was booked into the custody and care of SPJ, located in Roseville, Placer County, California, on felony charges and began awaiting trial in the Superior Court of California in and for the County of Placer.

**18.** On 20 October 2022, PETITIONER was transferred to PCJ, located in Auburn, Placer County, California.

**19.** On 14 November 2022, PETITIONER was found guilty by trial.

**20.** On 14 December 2022, PETITIONER was sentenced to prison resulting from the adjudication of guilt.

**21.** On 22 December 2022, PETITIONER was transferred into the custody of the California Department of Corrections and Rehabilitation ("**CDCR**").

**22.** Each paragraph of this complaint is expressly incorporated into each claim which is part of this complaint.

**23.** On information and belief, the relevant acts and omissions of DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS and DOE OFFICERS, hereinafter, persistently breach the plane of cruelty, malice, apathy, immorality, oppression, and hatred, or some combination thereof, toward PLAINTIFF.

**24.** On information and belief, POWERS, DOE SUPERVISORS, and DOE OFFICERS were aware that PLAINTIFF's conditions of confinement, as described herein, were arbitrary, purposeless, or excessive in relation to legitimate goals or objectives.

**25.** PLAINTIFF shared his experience with POWERS, DOE SUPERVISORS, and DOE OFFICERS via 55 administrative grievances in the attempt to induce awareness of the severe and injurious conditions of confinement within COUNTY's jails.

**26.** PLAINITFF, at all relevant times, was present as a *Homo sapiens*: a biomechanical creature designed to be recurrently active during the day with brief periods of rest.

**27.** On information and belief, Plaintiff averaged 8 miles per day walking in the months preceding his detention at SPJ on May 8, 2022. Throughout PLAINTIFF's adult life he averages several miles per day walking, biking, skating, or otherwise – excluding any periods of incarceration.

## CLAIM I

**28. State the constitutional or other federal civil right that was violated:** The Fourteenth Amendment of the United States Constitution under the Due Process Clause.

**29. Claim I.** Identify the issue involved: Amount of daily cell confinement.

**30. Supporting Facts:** Virtually all of the cells at SPJ measure about 12'x'6 and are furnished with: a toilet/sink combo, a stool, a desk, a lower bunk, and an upper bunk. With no furnishings, there would be 72 $ft^2$ of floor space available for free movement. Because of the furnishings, only about 30 $ft^2$ of floor space is available for free movement.

**31.** On information and belief, when two occupants are housed in a cell, one person must be on their bunk while the other person moves around on the floor area. The reason is that it is too small of a space for both occupants to be up and moving around at the same time comfortably and allowing for minimum personal space (18-36 inches of space from a person's body depending on preference).

**32.** SPJ's cells provided no comfortable seating for PLAINITFF. There is only one metal stool available for use, double-occupancy notwithstanding.

**33.** Double-occupancy caused PLAINTIFF to observe of others' bowel and urinary secretions via visual and olfactory senses. (They are called secretions for a reason.)

**34.** When not locked inside of the cell (otherwise termed "**lockdown**") PLAINTIFF was at liberty to utilize the large space adjoining the cells known as the 'dayroom.' The dayroom provides a route to walk, bookshelves with literature, kiosks and tablets, workout area access, showers, phones, video visiting, comfortable seating, social engagements, etc.

**35. On information and belief, confinement to a cell, for many hours per day, causes issues ranging from emotional distress and cognitive dysfunction to migraine, sleep disorder, hallucination, pains and aches, constipation, and muscular atrophy –** *not all from lack of exercise* **– simply from locking a human being into a tiny space for an excessive number of hours per day.**

**36.** PLAINTIFF's excessive confinement was manifest as limited or no resources, limited or no social interactions, limited or no communication with family, decline in self-esteem and dignity, injured appearance, and impaired cognition at court hearings and professional appointments.

**37.** Defendants SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS were directly responsible for the scheduled activities at SPJ and thus were directly responsible for PLAINTIFF's lockdown schedule.

**38.** Defendants DOE BSCC and COUNTY were indirectly responsible for the scheduled activities at SPJ because of their respective roles in establishing and approving customs and policies. Thus, DOE BSCC and COUNTY are also responsible for PLAINTIFF's lockdown schedule.

**39.** The daily schedules of activities for detainees at SPJ are policies, practices, or customs of Defendant COUNTY.

**40.** SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS locked PLAINTIFF into a cell for 19.5 hours daily, at minimum.

**41.** DOE BSCC and COUNTY knew of, or should have known of, and acquiesced to locking PLAINTIFF into a cell for 19.5 hours daily, at minimum.

**42.** On information and belief, PLAINTIFF was locked into a cell for an

1  excessive number of hours each day at SPJ by SHERIFF, POWERS, DOE
2  SUPERVISORS, and/or DOE OFFICERS and the lockdown was a form of torture
3  and/or excessive in relation to a legitimate purpose.

4      **43.** At all times, day and night, DOE OFFICERS and/or DOE SUPERVISORS
5  staffed the officer's station, a raised platform in the dayroom of PLAINTIFF's
6  housing unit.

7      **44.** During several hours each day, the dayroom *was unused by any*
8  *detainees,* yet DOE OFFICERS and/or DOE SUPERVISORS occupied the guard
9  station.

10     **45.** On information and belief, during such periods that the dayroom was
11  unused by detainees, it was possible for PLAINTIFF to be out of his cell and using
12  the dayroom.

13     **46.** On information and belief, PLAINTIFF was locked his cell during periods
14  when the dayroom was unused because SHERIFF, POWERS, DOE SUPERVISORS,
15  and/or DOE OFFICERS intended punishment for PLAINTIFF or for no purpose at
16  all with no bearing on a governmental objective.

17     **47.** SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS scheduled
18  extra activities - such as religious services or education – concurrently with
19  scheduled dayroom so that extra time out of the cell was not available.

20     **48.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE
21  OFFICERS cumulatively forced PLAINTIFF to spend the majority of his waking
22  hours in a tiny jail cell while detained at SPJ waiting for trial.

23     *PHASE I – Ad-seg & Quarantine*

24     **49.** From 5/8/2022 to 5/22/2022, PETITIONER was confined, single-occupancy,
25  to a cell in the Administrative Segregation Unit ("**ASU**") at SPJ and on
26  quarantine status. PETITIONER was on lockdown for 47.5 hours out of every 48
27  hours during this period.

28     **50.** On information and belief, despite reasonable alternatives available to

1 mitigate the risk of COVID-19 (the purported reason for the quarantine) DOE
2 BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS
3 chose the most punitive and/or harmful option available: locking PLAINTIFF in  a
4 tiny cell for as many hours as possible.

5 **51.** PLAINTIFF was not given the option to waive quarantine protocols.

6 **52.** On information and belief, If such quarantine protocols were necessary,
7 people throughout the region would have been confined to their homes, but
8 at this late stage after the outbreak of COVID-19 there were virtually no
9 restrictions on citizens.

10 **53.** Spending 47.5 hours per every two days in a 72ft$^2$ jail cell is not an inherent
11 discomfort of confinement.

12 *PHASE II – Ad-seg*

13 **54.** From 5/23/2022 to 6/1/2022, PETITIONER was confined, single-occupancy,
14 to a cell in the ASU at SPJ and was on lockdown for 23 hours out of every 24
15 hours.

16 **55.** On information and belief, there was no valid reason for PETITIONER to be
17 held in the ASU. Petitioner, having a documented history of confinement within
18 COUNTY had never had a single incident of in-custody violence.

19 **56.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE
20 OFFICERS, cumulatively, through actions or inactions, coerced PETITIONER in
21 regard to court proceedings, by forcing PETITIONER to spend 23 out of every 24
22 hours in a cell.

23 **57.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE
24 OFFICERS, cumulatively, through actions or inactions, impaired cognitive and
25 emotional functions of PETITIONER by forcing him to spend 23 out of every 24
26 hours in a cell.

27 **58.** Spending 23 hours per day in a 72 ft$^2$ jail cell is not an inherent discomfort
28 of confinement.

*PHASE III – General Population*

**59.** From 6/2/2022 to 10/20/2022, PETITIONER was confined to a double-occupied cell in *A-Unit* (general population) at SPJ and was locked-down for a more than 19.5 hours out of every 24 hours on average.

**60.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS scheduled, or acquiesced to the schedule of, 19.5 hours of lock-down per day for A-Unit.

**61.** On several occasions - nearly once per week on information and belief - PETITIONER was locked-down with another detainee for periods ranging from 24 to 42 hours.

**62.** Spending more than 19.5 hours per day in a 72 ft² jail cell, with another person, over a period of several months is not an inherent discomfort of confinement.

**63.** Spending more than 19.5 hours per day in a 72 ft² jail cell, with another person, over a period of several months is excessive, arbitrary, or purposeless in in relation to a legitimate objective or goal.

**64.** The purpose of pretrial detention is to ensure PLAINTIFF's presence at trial by the least restrictive means. DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS practice of confining PLAINTIIFF to a cell in excess of 8-10 hours per 24 hours was punitive, arbitrary, purposeless or excessive in relation to a legitimate government objective.

**65.** The cells at SPJ, especially when double-occupied, are designed for people to spend time sleeping in – not for all-day confinement. (See *Stewart v. Gates*, 450 F. Supp. 583, 587 (1978); *Bell v. Wolfish*, 441 U.S. 520, 543 (1979).)

**66.** On information and belief, When SPJ first become operational, around 2017, inmates were only required to spend about 9 hours per 24 hours in their cells; that is the scheduling that the jail was approved for and/or designed to support.

**67.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS' practice of excessive in-cell confinement degraded PLAINTIFF's capabilities at court hearings. *Examples follow in the next 3 paragraphs:*

**68.** Coercion. Signing a plea deal virtually always results in transfer to a place that schedules less in-cell confinement. In fact, such transfer cannot occur until the criminal case is resolved. Each time PLAINTIFF makes decisions that result in delay to the resolution of the criminal case PLAINTIFF is faced with further time at SPJ rather than time at a place that has much better conditions especially in respect to out-of-cell time.

**69.** Cognitive decline. The limited intellectual and sensory stimuli available to PLAINTIFF spending excessive hours in a cell results in poor judgment and decision-making.

**70.** Emotional distress. The stress imposed upon PLAINTIFF from spending excessive hours in a cell resulted in repression, intimidation, and fear.

**71.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS employ excessive hours of in-cell confinement to maliciously punish pretrial detainees.

**72.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS employ excessive hours of in-cell confinement although it is excessive in relation to its alleged purpose.

**73.** The reason for the schedule being set at 19.5 hours of lockdown each day is arbitrary and purposeless in relation to a legitimate penalogical interest.

**74.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS utilized excessive in-cell confinement to maliciously punish PLAINTIFF and/or it was excessive in relation to its alleged purpose.

**75.** PLAINTIFF experienced several periods of unremitting lockdown imposed upon him by DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS exceeding 24 hours that were arbitrary or purposeless in relation

to a legitimate penalogical interest:

**76.** 26 hours from 9/3/2022-9/4/20233

**77.** 35 hours from 7/8/2022-7/10/2022

**78.** Several other periods of lockdown in excess of 24 hours; nearly once per week.

**79.** The excessive amounts of lockdown acted as coercion on Plaintiff in respect to the decisions he was making in the criminal case he was fighting. Plaintiff felt the pressure of coercion when making choices that could result in transfer elsewhere than in the custody DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS and their inconsiderate customs.

**80.** The schedule of activities at SPJ is a persistent official policy or custom of COUNTY, and is established and administered by DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS.

**81.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS, cumulatively, through action or inaction, coerced PETITIONER, into accepting plea deals, or otherwise intimidate or coerce PETITIONER in regards to court proceedings, by forcing PETITIONER to spend 23 out of every 24 hours in a cell.

**82.** The schedule at SPJ that consisted of extreme amounts of in-cell confinement was arbitrary or purposeless in relation to legitimate penalogical interests and/or was a means of torture, coercion, and/or punishment, making it the moving force of the violation of PLAINTIFF's substantive Due Process rights.

**83.** Defendants DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS did not provide a reason for the extreme amounts of in-cell confinement.

**84.** PLAINTIFF submitted grievances on 5/30/22, 6/26/22, 7/8/22, 8/21/22, 9/4/22, 9/14/22, and 9/25/22 to alert DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS to the harms PLAINTIFF was suffering

1 | from excessive in-cell confinement.

2 | **85.** Defendants POWERS and DOE SUPERVISORS claimed that, "Title 15,"
3 | standards were being met. However, no California Code of Regulations, Title 15
4 | standards regarding in-cell confinement existed at that time.

5 | **86. Injury**: Violation of rights, impaired quality of life, loss of liberty, and injury
6 | to appearance and performance at court hearings. Mental and emotional
7 | harm.

8 | **87. Administrative Remedies:**

9 |     **a.** Are there any administrative remedies available at your institution?   Yes

10 |     **b.** Did you submit a request for administrative relief on Claim I?   Yes

11 |     **c.** Did you appeal your request for relief on Claim I to the highest level?   Yes

12 |

## CLAIM II

1.   State the constitutional or other federal civil right that was violated: _____
_Attached,  pgs. 4-A through 4-E_ .

2.   **Claim II.** Identify the issue involved. Check **only one**. State additional issues in separate claims.

- ☐ Basic necessities
- ☐ Mail
- ☐ Access to the court
- ☐ Medical care
- ☐ Disciplinary proceedings
- ☐ Property
- ☐ Exercise of religion
- ☐ Retaliation
- ☐ Excessive force by an officer
- ☐ Threat to safety
- ☒ Other: _Sleep_ .

3.   **Supporting Facts.** State as briefly as possible the FACTS supporting Claim II. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

_Attached, pgs. 4-A through 4-E_

4.   **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
_Deprivation of rights, infliction of punishment, physical pain and discomfort. Separately, mental and emotional distress and harm.
See pg. 4-E and exhibits_

5.   **Administrative Remedies.**
   a.   Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?   ☒ Yes  ☐ No
   b.   Did you submit a request for administrative relief on Claim II?   ☒ Yes  ☐ No
   c.   Did you appeal your request for relief on Claim II to the highest level?   ☒ Yes  ☐ No
   d.   If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

4

## CLAIM II

**88. State the constitutional or other federal civil right that was violated:** The Fourteenth Amendment of the United States Constitution under the Due Process Clause.

**89. Claim II.** Identify the issue involved: Sleep.

**90. Supporting Facts:** Plaintiff repeats and re-alleges each and every of the foregoing allegations with the same force and effect as if fully set forth herein.

**91.** At approximately 0400 hours, every day, at SPJ and PCJ, PLAINTIFF was awakened by DOE OFFICERS for medication distribution.

**92.** The general disturbance created by medication distribution is such that all detainees are awakened regardless of whether they are receiving medication or not. The process begins with all the lights being turned on bright. Next, at SPJ, DOE OFFICERS open the slots on the front of every cell door; a series of very noisy, clamorous actions. At PCJ, there are fewer doors opening and slamming, but it is still sufficient to awaken all detainees. Next, the nurse passes medication to each recipient. Finally, the nurse finishes, and the lights are turned back to low.

**93.** At approximately 0500 hours breakfast is served.

**94.** At approximately 0700 hours each detainee's wristband is verified by DOE OFFICERS. A process that involves waking each detainee that is sleeping.

**95.** At approximately 0715 detainees are called for transportation for court.

**96.** At night, dayroom concludes at 2200 hours.

**97.** At night, cleaning the unit concludes at 2300 hours. Until 2300 hours, the lights are fully bright and noises of cleaning are too loud to permit sleep.

**98.** Naturally, PLAINTIFF falls asleep between 2200 and 2330 hours.

**99.** In COUNTY's jails, PLAINTIFF fell asleep at odd times of the day and night; likely due to the sleep deprivation caused by the 0400 hours wake-up time. Additionally, 0400 hours wake-up was followed by an inability to go back to

1 sleep until after 0700 hours, even as late as 1800 hours if PLAINTIFF had court
2 that day.

3 **100.** Defendants SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS
4 were directly responsible for the scheduled activities and thus were directly
5 responsible for PLAINTIFF's sleep schedule.

6 **101.** Defendants DOE BSCC and COUNTY were indirectly responsible for the
7 scheduled activities because of their respective roles in establishing and
8 approving customs and policies. Thus, DOE BSCC and COUNTY are also
9 responsible for PLAINTIFF's sleep schedule.

10 **102.** The daily schedules of activities for detainees at SPJ are policies,
11 practices, or customs of Defendant COUNTY.

12 **103.** DOE OFFICERS woke PLAINTIFF up before he got adequate sleep.

13 **104.** DOE BSCC, COUNTY, SHERIFF, POWERS, and DOE SUPERVISORS knew of, or
14 should have known of, and acquiesced to waking PLAINTIFF up before he got
15 adequate sleep.

16 **105.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE
17 OFFICERS are responsible for ensuring that practices, policies, and customs
18 allow PLAINTIFF to get a full night's sleep.

19 **106.** On information and belief, DOE BSCC, COUNTY, SHERIFF, POWERS, DOE
20 SUPERVISORS, and/or DOE OFFICERS designed the schedules SPJ and PCJ for
21 maximum disruption of PLAINTIFF's (and all other detainees') sleep.

22 **107.** Please take judicial notice of EXHIBIT A: an article from a website and
23 provided to PLAINTIFF by the *Stanford Health Library*. The Exhibit is a printout of:
24 https://medicalnewstoday.com/articles/circadian-rhythms, accessed on
25 2/9/2024. On page 2 of EXHIBIT A, the article describes that, "[m]elatonin peaks
26 around 2-4 A.M. and then reduces by morning, allowing for wakefulness." The
27 article explains on page 1 that, "circadian rhythms are the approximate 24-
28 hour patterns the body and brain go through, allowing for changes in the

body's physical and mental states, along with mood and behavioral changes." On pages 1-2, "Other examples of circadian rhythms include:

- hormonal activity
- body temperature
- digestion
- immune function."

**108.** On information and belief, DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS, in efforts to inflict maximum punishment, utilize the science of the circadian rhythm against pretrial detainees, including PLAINTIFF, at COUNTY's jails by daily waking all detainees just before 4 A.M. - the part of the night when they are likely in deepest sleep - and thereby disrupting the natural sleep rhythms of PLAINTIFF and all pretrial detainees. Such disruption negatively affect the physical and mental functions of PLAINTIFF and pretrial detainees; see EXHIBIT A.

**109.** Please take judicial notice of EXHIBIT B: an article from a website and provided to PLAINTIFF by the *Stanford Health Library*. The Exhibit is a printout of: https://my.clevelandclinic.org/health/diseases/23970-sleep-deprivation, accessed on 2/9/2024. On page 1 of EXHIBIT B, the article describes that adults require, "7 to 9 hours," of sleep and that, "chronic sleep deprivation can cause or contribute to a variety of health issues." Page 3 details the harms of sleep deprivation, such as: "very negative effects on how your brain works," and, "negatively affects your mental health," amongst a host of other health issues. Page 5 offers a graphic representation of different sleep deprivation symptoms. Page 7 details the causes of sleep deprivation, which include: "bad sleep-related habits." Pages 9 and 10 suggest methods of managing sleep-related symptoms, such as: "[m]ake the time for sleep. Set a bedtime that allows you to get the recommended amount of sleep for your age. Limit the time you spend around bright lights or using electronics. Light from these too close to

bedtime can disrupt your body's natural sleep-wake functions. [...] Don't rely on sleeping medications." Finally, on page 11, "[s]leep deprivation lasts as long as a person isn't getting enough sleep. This can be a single night or last for weeks, months, or even years."

**110.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS do, and did, not maintain conditions that allow for PLAINTIFF to get adequate sleep. The lights do not go dim, and the noise doesn't cease, until 2300 hours, yet at 0400 hours PLAINTIFF, and all other pretrial detainees, were awakened by the operation of medication distribution.

**111.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS are responsible for the establishment, or failure to establish, conditions of confinement at SPJ and PCJ that are minimally adequate to support healthy adults.

**112.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS implemented practices, customs, and policies, via the jails' operational schedules, that prevented PLAINTIFF from obtaining healthy sleep.

**113.** The schedule, which is a policy and custom promulgated by COUNTY, SHERIFF, POWERS, and DOE SUPERVISORS is the moving force behind the punishment, or the arbitrarily and purposeless action in relation to legitimate penalogical need, waking PLAINTIFF so he could not get adequate sleep.

**114.** Scheduling PLAINTIFF for 5 hours of sleep per night is intended punishment, or arbitrary and purposeless in relation to legitimate penalogical needs.

**115.** PLAINTIFF was unable to get enough sleep per night because of the 0400 hours wake-up time in combination with the time that it was possible to fall asleep at SPJ and PCJ, usually at 2330 hours.

**116.** The purpose of pretrial detention is to ensure detainees' presence at trial by the least restrictive means. The practice of scheduling detainees for only 5 hours of sleep is punitive, arbitrary, purposeless, excessive, or a combination

1 thereof, in relation to the purpose of ensuring detainees' presence at trial.

2 **117.** The failure of DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS,

3 and/or DOE OFFICERS to promulgate a necessarily healthy sleep schedule

4 acted as coercion on Plaintiff in respect to the decisions he was making in the

5 criminal case he was fighting. Plaintiff felt the pressure of coercion when

6 making choices that could result in transfer elsewhere than in the custody DOE

7 BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS

8 and their inconsiderate customs.

9 **118.** Defendants DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS,

10 and/or DOE OFFICERS did not explain the reason for the extremely early wake-

11 up times.

12 **119.** Plaintiff put COUNTY on notice regarding his sleep deprivation as follows:

13 **120.** PLAINTIFF submitted a grievance on 7/26/22 to alert DOE BSCC, COUNTY,

14 SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS to the harms

15 PLAINTIFF was suffering due to the deficient sleep schedule.

16 **121. Injury:** Violation of rights, impaired quality of life, loss of liberty, and injury

17 to appearance and performance at court hearings. Mental and emotional

18 harm.

19 **122. Administrative Remedies:**

20    **a.** Are there any administrative remedies available at your institution?    Yes

21    **b.** Did you submit a request for administrative relief on Claim II?    Yes

22    **c.** Did you appeal your request for relief on Claim II to the highest level? Yes

23

## CLAIM III

1.  State the constitutional or other federal civil right that was violated: _____
    Attached, pgs. 5-A through 5-C .

2.  **Claim III.** Identify the issue involved. Check **only one**. State additional issues in separate claims.
    - ☐ Basic necessities     ☐ Mail     ☐ Access to the court     ☐ Medical care
    - ☐ Disciplinary proceedings     ☐ Property     ☐ Exercise of religion     ☐ Retaliation
    - ☐ Excessive force by an officer     ☐ Threat to safety     ☒ Other: Diet _____.

3.  **Supporting Facts.** State as briefly as possible the FACTS supporting Claim III. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.
    Attached, pgs. 5-A through 5-C.
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____

4.  **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
    Deprivation of rights, infliction of punishment, physical pain and discomfort.
    Separately, mental and emotional distress and harm.
    See pg 5-C

5.  **Administrative Remedies.**
    a.  Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?     ☒ Yes ☐ No
    b.  Did you submit a request for administrative relief on Claim III?     ☒ Yes ☐ No
    c.  Did you appeal your request for relief on Claim III to the highest level?     ☒ Yes ☐ No
    d.  If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____.

**If you assert more than three Claims, answer the questions listed above for each additional Claim on a separate page.**
CLAIM IV: pgs. 5-D through 5-G; CLAIM V: pgs. 5-H through 5-J.

5

## CLAIM III

**123. State the constitutional or other federal civil right that was violated:** The Fourteenth Amendment of the United States Constitution under the Due Process Clause.

**124. Claim II. Identify the issue involved:** Diet.

**125. Supporting Facts:** Plaintiff repeats and re-alleges each and every of the foregoing allegations with the same force and effect as if fully set forth herein.

**126.** Both SPJ and PCJ utilize the same meal plan for detainees' diets.

**127.** On information and belief, PLAINTIFF was provided with a diet that was nutrient deficient while in custody of COUNTY

**128.** On 8/7/2022 PLAINTIFF submitted oral and written grievances regarding the nutritional content of the meals and that the meals were not being served as they were listed on the menus. POWERS, DOE SUPERVISORS and/or DOE OFFICERS responded negatively to PLAINTIFF's complaint. POWERS, DOE SUPERVISORS and/or DOE OFFICERS claim that the diet is and was adequate.

**129.** In response to PLAINTIFF's complaints on 8/7/2022, POWERS, DOE SUPERVISORS and/or DOE OFFICERS made some changes so that the meals improved significantly in terms of portion size and accuracy compared with the written menu, but they still did not match the menu.

**130.** The written menu was not adhered to at nearly every meal that PLAINTIFF was served while in custody of COUNTY.

**131.** PLAINTIFF submitted grievances on 8/15/2022, 8/28/2022, 9/1/2022, 9/8/2022, 9/28/2022, 10/8/2022, 10/9/2022, and 10/14/2022 detailing the menu's deficiencies as PLAINTIFF perceived them. The response by POWERS, DOE SUPERVISORS and/or DOE OFFICERS was that the dietician had it all under control.

**132.** However, the diet definitely lacked appropriate types and quantities of protein.

**133.** The diet consisted of far too many sugars, starches, and carbohydrates.

**134.** The cooked food was consistently overcooked, depleting the nutrient content of the food.

**135.** PLAINTIFF consistently felt hungry while in the custody of COUNTY from 5/8/2022 to 12/14/2022.

**136.** DOE BSCC, COUNTY, SHERIFF, POWERS and/or DOE SUPERVISORS are responsible for ensuring that detainees, such as PLAINTIFF are fed an appropriate diet.

**137.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS implemented practices, customs, and policies that prevented PLAINTIFF from eating a healthy diet.

**138.** The foodservice guidelines and procedures, which are a policies and customs promulgated by COUNTY, SHERIFF, and POWERS are the moving force behind the punishment, or the arbitrarily and purposeless action in relation to legitimate penalogical need, in the form of deficient diet provided to PLAINTIFF.

**139.** Providing a deficient diet is intended punishment, or arbitrary and purposeless in relation to legitimate penalogical needs.

**140.** The purpose of pretrial detention is to ensure detainees' presence at trial by the least restrictive means. The practice of serving a different diet than is listed on the menu and approved by a dietician is punitive, arbitrary, purposeless, excessive, or a combination thereof, in relation to the purpose of ensuring detainees' presence at trial.

**141.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS acquiesced to a foodservice program that served nutrient deficient meals to PLAINTIFF.

**142.** DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS did not audit or monitor the foodservice production for discrepancies

1  compared with the menu.

2  **143.** The failure of DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS,
3  and/or DOE OFFICERS to promulgate procedures to guarantee an adequately
4  served diet acted as coercion on Plaintiff in respect to the decisions he was
5  making in the criminal case he was fighting. Plaintiff felt the pressure of
6  coercion when making choices that could result in transfer elsewhere than in
7  the custody DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or
8  DOE OFFICERS and their inconsiderate customs.

9  **144.** Defendants DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS,
10 and/or DOE OFFICERS did not explain the reason that the diet did not match
11 the menu.

12 **145.** Defendants DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS,
13 and/or DOE OFFICERS did not admit that anything was wrong with the diet
14 being served, even though it did improve after PLAINTIFF's initial complaint and
15 though the served meals very frequently didn't match the menu.

16 **146.** Defendants DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS,
17 and/or DOE OFFICERS were apathetic to the poor nutrition provided to
18 PLAINTIFF while in the custody of COUNTY.

19 **147. Injury:** Violation of rights, impaired quality of life, and injury to
20 appearance and performance at court hearings. Mental and emotional harm.

21 **148. Administrative Remedies:**

22     **a.** Are there any administrative remedies available at your institution?    Yes

23     **b.** Did you submit a request for administrative relief on Claim III?    Yes

24     **c.** Did you appeal your request for relief on Claim III to the highest level? Yes

## CLAIM IV

**149.** State the constitutional or other federal civil right that was violated:

Municipal Liability – Failure to Train/Supervise (42 U.S.C. § 1983)

**150. Claim III.** Identify the issue involved: Civil Rights.

**151. Supporting Facts:** Plaintiff repeats and re-alleges each and every of the foregoing allegations with the same force and effect as if fully set forth herein.

**152.** The acts and omissions of Defendants DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS of his particular rights under the United States Constitution.

**153.** Pleaded in the alternative, PLAINTIFF's injuries were caused by DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS' failures to adequately train and supervise its employees, including each other (where applicable), about sleep health, the effects of excessive in-cell confinement, and/or appropriate nutrition and diet.

**154.** Pleaded in the alternative, PLAINTIFF's injuries were caused by DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS' failures to adequately train and supervise its employees, including each other (where applicable), in regard to detaining PLAINTIFF under the least restrictive means necessary to ensure his presence at trial. This failure to train and supervise was a direct contributing factor to PLAINTIFF's constitutional deprivations as alleged herein.

**155.** Education about the damaging effects of cell confinement was not provided to POWERS, DOE SUPERVISORS, and/or DOE OFFICERS.

**156.** Education about the needs of human beings in regards to sleep health was not provided to POWERS, DOE SUPERVISORS, and/or DOE OFFICERS.

**157.** Education about the needs of human beings in regards to diet was not provided to POWERS, DOE SUPERVISORS, and/or DOE OFFICERS.

**158.** These failures to train demonstrates a deliberate indifference to the rights

1 of COUNTY's detainees, including PLAINTIFF. The abject failures to train and
2 supervise is in evidence by the failure of DOE BSCC, COUNTY, SHERIFF, POWERS,
3 DOE SUPERVISORS, and/or DOE OFFICERS to address the serious and obvious
4 political, mental, emotional, and physical needs of PLAINTIFF and the failure to
5 honor PLAINTIFF's constitutional right to be detained under the least restrictive
6 means necessary.

7 **159.** In doing the acts and/or omissions herein alleged, resulting from  DOE
8 BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS'
9 failure to train and supervise, defendants, and each of them, were deliberately
10 indifferent to the serious political, mental, emotional, and physical needs of
11 PLAINTIFF. Unnecessary rights deprivations, punishment, pain, emotional distress,
12 cognitive impairment and physical injury was inflicted upon PLAINTIFF. The
13 actions and inactions of the defendants resulted in a violation of rights under
14 the Fourteenth Amendment of the United States Constitution.

15 **160.** On information and belief, Defendants DOE BSCC and/or COUNTY failed
16 to properly and adequately train SHERIFF, POWERS, DOE SUPERVISORS, and/or
17 DOE OFFICERS on subject matters including, but not limited to, pretrial
18 detainees' rights. SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS
19 failed to make provision to detain pretrial detainees under the least restrictive
20 means possible which caused arbitrary and needless suffering to PLAINTIFF.

21 **161.**  On information and belief, Defendants SHERIFF, POWERS, and/or DOE
22 SUPERVISORS failed to properly and adequately train DOE OFFICERS on subject
23 matters including, but not limited to, pretrial detainees' rights. DOE OFFICERS
24 failed to make provision to detain pretrial detainees under the least restrictive
25 means possible which caused arbitrary and needless suffering to PLAINTIFF.

26 **162.** Confining PLAINTIFF to a cell, at an average exceeding 19.5 hours per
27 day, was punitive and unrelated to a legitimate penological interest.

28 **163.** Confining PLAINTIFF under conditions that permitted a  maximum of 5

hours of sleep per night, and usually less, was punitive and unrelated to a legitimate penalogical interest.

**164.** The training policies of defendants DOE BSCC, COUNTY, SHERIFF, POWERS, and/or DOE SUPERVISORS were not adequate to train its correctional employees at COUNTY's jails to handle the usual and recurring situations with which they must deal, including caring and providing for the needs of human beings.

**165.** Defendants DOE BSCC, COUNTY, SHERIFF, POWERS, and/or DOE SUPERVISORS were deliberately indifferent to the obvious consequences of failing to train its subordinates and/or correctional officers correctly.

**166.** The failure of Defendants DOE BSCC, COUNTY, SHERIFF, POWERS, and/or DOE SUPERVISORS to provide adequate training caused the deprivation of PLAINTIFF's rights by POWERS, DOE SUPERVISORS, and/or DOE OFFICERS; that is, Defendants' failure to train is so closely related to the deprivation of PLAINTIFF's rights as to be the moving force that caused the ultimate injury.

**167.** As a direct and proximate result of the aforementioned conduct, PLAINTIFF experience severe pain and suffering. As a direct and proximate cause of the acts of POWERS, DOE SUPERVISORS, and/or DOE OFFICERS, PLAINTIFF suffered loss of liberty, violation of rights, emotional distress, mental anguish, and physical pain.

**168.** When municipal policy-makers are on actual or constructive notice that an omission in their training program causes employees to violate citizens' constitutional rights, the municipality is deliberately indifferent if it fails to correct the omission.

**169.** COUNTY's jails are inadequate for detaining citizens awaiting trial if they are not educated about various and evolving scientific findings in regards to human needs. POWERS, DOE SUPERVISORS, and/or DOE OFFICERS are not properly trained when such information is ignored and results in constitutional

1 violations

2 **170.** After acknowledging the facts of PLAINTIFF's complaints about lack of
3 sleep and excessive in-cell confinement, POWERS, DOE SUPERVISORS, and/or
4 DOE OFFICERS were not trained to know that continuing to subject plaintiff to
5 such conditions lead to progressive deterioration of PLAINTIFFs appearance,
6 emotional state, cognition, and/or was excessive in relation to legitimate
7 penalogical interests establishes substandard training.

8 **171. Injury:** Violation of rights, impaired quality of life, loss of liberty, and injury
9 to appearance and performance at court hearings. Mental and emotional
10 harm.

11 **172. Administrative Remedies:**

12    **a.** Are there any administrative remedies available at your institution?    Yes

13    **b.** Did you submit a request for administrative relief on Claim III?    Yes

14    **c.** Did you appeal your request for relief on Claim III to the highest level? Yes

## CLAIM IV

**173. State the constitutional or other federal civil right that was violated:** Municipal Liability (42 U.S.C. § 1983)

**174. Claim III.** Identify the issue involved: Civil Rights.

**175. Supporting Facts:** Plaintiff repeats and re-alleges each and every of the foregoing allegations with the same force and effect as if fully set forth herein.

**176.** Defendants DOE BSCC, COUNTY, SHERIFF, and/or POWERS maintained an unconstitutional policy, ordinance or regulation which allowed POWERS, DOE SUPERVISORS, and/or DOE OFFICERS to violate PLAINTIFF's Fourteenth Amendment right to be free from the infliction of punishment as a pretrial detainee.

**177.** There were longstanding and systemic deficiencies at COUNTY's jails. Deficiencies included the excessive amounts of lockdown, scheduling that allowed only five hours of sleep per night, and nutritional deficiencies.

**178.** The above-described customs, policies, practices, and/or procedures of the COUNTY were a moving force and/or proximate cause of the deprivations of Plaintiff's constitutional rights in violation of 42 U.S.C. §1983.

**179.** Defendants DOE BSCC and COUNTY are liable for the violations of Plaintiff's rights by their final policy makers, including SHERIFF, POWERS, and DOE SUPERVISORS.

**180.** Plead alternatively; COUNTY is liable for the violations of Plaintiff's rights by its final policy makers, including SHERIFF, POWERS, DOE SUPERVISORS, and DOE OFFICERS.

**181.** The unconstitutional actions and/or omissions of the individually named Defendants, DOE SUPERVISORS and DOE OFFICERS were approved, tolerated, and/or ratified by policy making officers for the COUNTY including, but not limited to, DOE BSCC, SHERIFF, POWERS, and/or DOE SUPERVISORS. Plaintiff is informed and believe, and thereupon allege, the details of these incidents

have been revealed to the authorized policymakers within the COUNTY and that such policymakers have direct knowledge of the fact the PLAINTIFF was unlawfully punished, or subjected to poor treatment arbitrarily, due to excessive amounts of lockdown, forced sleep disruption/deprivation, and/or deficient diet due to their and their subordinates' misconduct and violations of PLAINTIFF's rights.

**182.** Notwithstanding this knowledge, the authorized policymakers within the COUNTY and its subdivisions have approved of SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS conduct and decisions in this matter to the extent such individuals were under their supervision and oversight, and have made deliberate, conscious and affirmative choice to endorse and ratify such conduct and decisions, and the basis for them, which resulted in the punishment of PLAINTIFF. By so doing, the authorized policymakers within the COUNTY and its subdivisions have shown affirmative agreement with the conduct of individual Defendants and other employees/agents under their supervision, and have ratified the unconstitutional acts of these individual Defendants, employees and agents.

**183.** The aforementioned choices, customs, policies, practices and procedures; the failure to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and, the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS were a moving force and/or a proximate cause of the deprivations of Plaintiff's clearly established and well-settled constitutional rights, in violation of 42 U.S.C. §1983 as more fully set forth above.

**184.** As a direct and proximate result of the foregoing unconstitutional actions, omissions, customs, policies, practices, and/or procedures of Defendants DOE BSCC, COUNTY, SHERIFF, POWERS, DOE SUPERVISORS, and/or DOE OFFICERS, or

1  the lack or inadequacy thereof, Plaintiff suffered liberty deprivations, and thus,

2  he is entitled to damages and penalties.

3  185. All defendants acted under color of state law at all relevant

4  times.

## E. REQUEST FOR RELIEF

State the relief you are seeking:

Compensatory damages according to the injuries claimed herein: deprivation of rights and liberties, infliction of punishments, physical pain and suffering, mental and emotional harm. Punitive damages according to the degree of misconduct of each defendant to deter similar conduct in the future. Nominal damages if applicable. Declatory relief. Cost of suit for my time and materials spent prosecuting this action. Any equittable relief that the Court deems just and proper. Mental and emotional compensation should be considered separatel so as not to disqualify this action under the PLRA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  April  27 , 2024
                    DATE

_____
SIGNATURE OF PLAINTIFF

_____
(Name and title of paralegal, legal assistant, or
other person who helped prepare this complaint)

_____
(Signature of attorney, if any)

_____
(Attorney's address & telephone number)

### ADDITIONAL PAGES

All questions must be answered concisely in the proper space on the form. If you need more space you may attach more pages, but you are strongly encouraged to limit your complaint to twenty-five pages. If you attach additional pages, be sure to identify which section of the complaint is being continued and number all pages. Remember, there is no need to attach exhibits to your complaint.

# EXHIBIT COVER PAGE



medicalnewstoday.com/articles/circadian-rhythms as accessed on 2/9/2024 by Stanford Health Library
*What to Know About Circadian Rhythms* by Jon Johnson

## 6 PAGES ON 6 PIECES OF PAPER

(PLUS THIS COVER SHEET)

# How it works, what affects it, and more

**medicalnewstoday.com**/articles/circadian-rhythms

Jon Johnson

## What to know about circadian rhythm

- What it is
- How it works
- What affects it?
- Possible dusruptions
- How to maintain
- Contacting a doctor
- Summary

Circadian rhythms are cycles in the body that occur roughly across 24 hours. In humans, circadian rhythms cause physical and mental changes in the body, including feelings of wakefulness and sleep.

However, several issues may alter these circadian rhythms, which could lead to sleep disruptions or other health issues.

Keep reading to learn more, including how it works, factors that may disrupt it, and some tips on maintaining a healthful circadian rhythm.

## What is a circadian rhythm?

A circadian rhythm is a natural process that takes place throughout every day. These rhythms take place everywhere, occurring throughout the natural world, such as in plants and other animals. They are essential to organisms and occur even in the absence of outside factors.

In humans, circadian rhythms are the approximate 24-hour patterns the body and brain go through, allowing for changes in the body's physical and mental states, along with mood and behavioral changes.

The sleep-wake cycle is one of the most widely recognized circadian rhythms. Humans tend to become tired at night and feel more awake during the day. This 24-hour pattern is what most people refer to when they talk about a circadian rhythm. However, they encompass factors other than sleep.

Other examples of circadian rhythms in humans include:

- hormonal activity
- body temperature
- digestion
- immune function

## How does it work?

Circadian rhythms are vital processes that function without external factors. This is because the body itself responds to biological clocks, which exist naturally in humans and their cells.

The National Institute of General Medical SciencesTrusted Source note that nearly every tissue and organ contain their own biological clocks. These are the result of certain proteins interacting with cells in the body, instructing them to be more active or to slow down.

One master clock in the body controls all these individual clocks. In humans, the master clock is a structure called the suprachiasmatic nucleus (SCN), which contains about 20,000 nerve cells and receives direct input from the eyes.

As the eyes perceive the bright light of day or the darkness of night, the SCN picks up on this information, telling the cells to act accordingly. Light keeps the circadian rhythm in sync with a 24-hour day.

In addition to reactions in the cells themselves, chemicals in the brain adjust in response to the cycles of the day.

These chemicals adjust a number of factors in the body, such as:

- hunger
- temperature
- arousal and awakeness
- mood

### How does it relate to sleep?

The body's circadian rhythms control the sleep-wake cycle. They play a role in sleep due to how the body and brain respond to darkness, which is when most humans feel tired and tend to sleep.

As darkness sets in, the body's biological clock instructs the cells to slow downTrusted Source. When the evening becomes dark, the hormone melatonin starts to rise and allows sleep to occur. Melatonin peaks around 2–4 A.M. and then reduces by morning, allowing wakefulness.

## What affects circadian rhythm?

Light is the major outside factor controlling the body's circadian rhythms. It keeps the circadian rhythm in sync with the Earth's natural 24-hour cycle. In addition, other environmental cues may help synchronize the circadian rhythm, including food intake and activity level. However, many things can disrupt this process.

## What can disrupt them?

While circadian rhythms occur naturally, several factors may affect them across the day.

### Light

Irregularly-timed light can easily disrupt a normal circadian rhythm.

The Centers for Disease Control and Prevention (CDC)Trusted Source note that the circadian clock is most sensitive around 2 hours before a person's usual bedtime. Using bright lights during this time can shift the need to sleep later, so a person may get sleepy and fall asleep later in the evening and wake up later in the morning.

In contrast, bright morning light can shift the need for sleep earlier. Sleeping in a bright room may also wake a person up earlier than necessary and displace their usual sleep time.

### Color

The color of lights appears to disrupt circadian patterns. The CDCTrusted Source note that blue wavelength light has the strongest impact.

Blue and white lights during sensitive periods of the day, such as 2 hours before bed, can make it difficult for a person to fall asleep or stay asleep. Common sources include electronic screens on devices such as phones, computers, and televisions.

Other wavelengths of light have less effect on the circadian clock.

### Unhealthful sleep habits

Having unhealthful sleep habits may disrupt the circadian clock across the day. This may include issues such as:

- going out late and waking up early
- having no set sleep time
- eating and drinking late at night
- consuming caffeine late at night
- using electronic devices late at night

- performing mentally stimulating activities late in the day
- having pain or discomfort in the sleeping space

Read about some tips and remedies for improving the quality of sleep here.

## Shift work

People who work late shifts or work throughout the night may experience disruptions in their natural circadian rhythms. As the body responds to the sun's natural light and dark cycles, shift work changes their circadian rhythms.

## Travel

People who travel frequently may experience disruptions in sleep and their circadian rhythms, especially if they often move between time zones. This is known as jet lag, the groggy or tired feeling as the body tries to catch up with time changes and the new rhythms of the day.

Read about some tips for getting over jet lag here.

## Underlying conditions

Underlying sleep disorders may affect circadian rhythms, including:

- **Delayed sleep phase syndrome:** When a person's circadian rhythm becomes delayed, so they prefer to fall asleep and wake later.
- **Advanced sleep phase syndrome**: The circadian rhythm is advanced, so a person feels sleepy earlier in the evening and wakes earlier in the morning.
- **Irregular sleep-wake disorder**: There is a lack of regular rhythm that leads to sleep and waking disruptions.
- **Non-24 hour sleep-wake disorder**: The circadian rhythm is not synchronized to a 24-hour day, resulting in periods of sleepiness and periods of insomnia.

Learn more about some of the other conditions that may lead to difficulty sleeping here.

## How to maintain a healthful circadian rhythm

There are several important factors to consider when maintaining a healthful circadian rhythm.

If possible, go to bed and wake up at the same time each day. Setting a regular time may help the body set its rhythms around these times. Some choose to set a morning alarm to wake up at the same time each day. This may help the body adjust and encourage tiredness when they need to sleep to wake up on time.

This regular sleep-wake schedule also includes days off from work, such as weekends.

As light can disrupt the circadian rhythms, it is important to choose when to limit exposure. The CDCTrusted Source note that the 2 hours before a person falls asleep appear to be most crucial. Avoiding blue light at this time may help ensure a regular circadian rhythm, which includes limiting screen time and any bright sources of white or blue light, such as in shops.

Other tips may help promote a healthful circadian rhythm, including:

- going outside or in bright light in the morning
- avoiding caffeine late in the day
- taking small naps in the early afternoon if a person needs to nap
- avoiding long naps or napping later in the day
- avoiding heavy meals
- performing calming activities before bed, such as reading or doing gentle stretches

Some calming herbal teas or supplements may help promote a sleepy state in people with trouble falling asleep. However, talk with a doctor before taking products with active ingredients.

## When to contact a doctor

While it is normal to feel groggy at times, anyone who regularly experiences sleep disruptions or feels their circadian rhythms are off may want to talk with their doctor.

Poor quality sleep or sleep deprivation can lead to health complications, including:

- hypertension
- diabetes or insulin resistance
- sleep apnea
- obesity
- heart attack
- stroke
- depression and anxiety
- psychosis

Learn more about the negative effects of sleep deprivation here.

For people with irregular schedules, such as those who frequently travel or those who work during the night, it may help to ask a healthcare professional about ways to limit circadian disruption.

Melatonin may help bring on sleep and reset the circadian rhythms, but it is important to use it correctly. Talk with a doctor before using hormones to reset a sleep cycle.

## Summary

Circadian rhythms are natural cycles the body goes through each day. The rhythm of sleep and wakefulness is the most widely recognized example of these rhythms.

Maintaining a healthful circadian rhythm may involve adjusting a person's habits to match the rhythms of nature, and may help prevent some issues with sleeping or waking.

Anyone uncertain about their symptoms should speak with a doctor for a full diagnosis and management plan.

Last medically reviewed on January 11, 2021

# EXHIBIT COVER PAGE



https://my.clevelandclinic.org/health/diseases/23970-sleep-deprivation

**as accessed on 2/9/2024 by Stanford Health Library**

*Sleep Deprivation* **by Cleveland Clinic**

## 13 PAGES ON 13 PIECES OF PAPER

(PLUS THIS COVER SHEET)

No. 2:22-cv-01740 TLN DB P          **EXHIBIT A**          (THIRD AMENDED COMPLAINT)
MCCLUNG v. CA. BOARD of STATE and COMMUNITY CORRECTIONS, et al.

# Sleep Deprivation

**my.clevelandclinic.org**/health/diseases/23970-sleep-deprivation

Cleveland Clinic medical professional

## Overview

### What is sleep deprivation?

Sleep deprivation is when a person doesn't get enough sleep. This can be a short-term issue, affecting one or a few nights, or it can be a chronic concern that lasts weeks or even months. Sleep deprivation can happen for countless reasons, many of them harmless, but it's also a key symptom of certain health conditions.

Sleep is something that everyone needs, and most people need a similar amount, depending on their age. That amount also changes with age. However, some people need more sleep to feel well-rested, while others need less, but these exceptions aren't common. A change in your sleep patterns, gradual or sudden, is a reason to talk to a healthcare provider.

The average daily amount of sleep needed, by age, is:

- Newborns (up to 3 months old): 14 to 17 hours.
- Infants (4 to 12 months old): 12 to 16 hours, including naptime.
- Young children (1 to 5 years old): 10 to 14 hours, including naptime.
- School-aged children (6 to 12 years old): 9 to 12 hours.
- Teenagers (13 to 18 years old): 8 to 10 hours.
- Adults (18 years and up): 7 to 9 hours.

Sleep deprivation can also take different forms. For some people, sleep deprivation happens because they stay awake instead of sleeping. For others, they're still sleeping, but they aren't getting quality sleep, so they still wake up feeling tired.

Sleep deprivation usually isn't a major problem in limited, isolated amounts. However, research shows that chronic sleep deprivation can cause or contribute to a variety of health issues.

### What is the difference between sleep deprivation and insomnia?

Insomnia and sleep deprivation are closely related but aren't the same thing. Insomnia is when you're unable to sleep when you try. Sleep deprivation is what happens when you don't give yourself enough time to sleep don't get enough sleep or both.

Case 2:22-cv-01740-TLN-SCR      Document 30      Filed 04/29/24      Page 49 of 63

## Who does it affect?

Sleep deprivation can happen to everyone at any point in their life.

## How common is this condition?

Sleep deprivation is very common. Experts estimate between 50 million to 70 million adults in the U.S. meet the medical criteria for sleep deprivation at any point in time. Virtually every human being experiences sleep deprivation at some point in their life. For some people, it's simply a greater or longer-lasting issue, or it happens for a more serious reason.

## How does this condition affect my body?

Your body needs sleep to regenerate certain systems and carry out certain processes. To understand more about that, it helps to know a little more about the human sleep cycle. That cycle involves different stages of sleep. Those are:

- **Stage 1**: Light sleep. This is a short stage, usually no more than 5% of your total sleep, which begins right after you fall asleep.
- **Stage 2**: Deeper sleep. This stage is deeper and makes up about 45% of all the time you spend sleeping (this number goes up as you get older). Research indicates this stage is key in memory storage and learning.
- **Stage 3**: Deepest sleep. This stage makes up about 25% of the time you spend sleeping (this number goes down with age). There's evidence that this stage is the most important to how your body recovers and maintains itself because the brain prioritizes this stage in people with sleep deprivation. It's very hard to wake someone up from this stage, and they'll usually feel foggy or confused for up to 30 minutes after waking up.
- **REM sleep**: REM stands for "rapid eye movement." This stage is when you dream. When a person is in REM sleep, you can see their eyes moving beneath their eyelids.

When you fall asleep, you typically enter stage 1 and then move in and out of stages 2 and 3. After that, you go into REM sleep and start dreaming. After the first REM cycle, you start a new sleep cycle and go back into stage 1 or 2. One cycle normally takes about 90 to 120 minutes before another begins. Most people go through four or five cycles per night (assuming they get a full eight hours).

### Systems affected

Sleep deprivation has negative effects in multiple ways throughout your body. Those can affect the following body systems, organs and processes:

- **Heart and circulatory systems**: Sleep deprivation has long-term damaging effects on your heart and circulatory health. People with chronic sleep deprivation are more likely to develop high blood pressure (hypertension) and high cholesterol (hyperlipidemia).
- **Metabolic systems**: People with chronic sleep deprivation are at a much higher risk of developing Type 2 diabetes.
- **Immune system**: Your body's natural defenses against infections can't work properly if you aren't getting enough sleep.
- **Nervous system**: It's common for people who aren't sleeping enough to have higher pain sensitivity, which means they feel pain more easily, the pain is more intense or both.
- **Brain**: Sleep deprivation has very negative effects on how your brain works. While experts don't fully understand sleep's role in brain function, they do know it's a key part of how people learn and remember. There's also some evidence that sleep deprivation could play a role in the development of Alzheimer's disease.
- **Mental health**: Sleep deprivation also negatively affects your mental health, making it harder for you to manage and process your emotions. People with sleep deprivation are more likely to feel symptoms of depression and anxiety.

The effects of sleep deprivation depend on why it happens and how long it lasts. The longer a person has sleep deprivation, the greater — and more severe — the effects.

**Conditions that can get worse or happen because of sleep deprivation**

Sleep deprivation also increases your risk of developing certain conditions or making them worse if you have them. These conditions include:

- Type 2 diabetes.
- High blood pressure (hypertension).
- Obesity.
- Obstructive sleep apnea.
- Vascular disease.
- Stroke.
- Heart attack.
- Depression.
- Anxiety.
- Conditions that involve psychosis.

## Symptoms and Causes





| Impaired judgment. | Impulsive (or even reckless) behavior. |
| --- | --- |

Cleveland Clinic

Sleep deprivation has many effects, ranging from mild to severe.

## What are the symptoms of sleep deprivation?

Sleep deprivation causes many symptoms. Some of the most common symptoms include:

- Daytime sleepiness.
- Fatigue.
- Irritability.
- Trouble thinking, focusing and remembering.
- Slowed reaction times.
- Headaches.

As sleep deprivation goes on for longer, the symptoms become more severe. Many of the more severe symptoms look like the effects of alcohol intoxication. The severe symptoms of sleep deprivation include:

- "Microsleeps" (when a person briefly falls asleep for only seconds before waking back up).
- Uncontrollable eye movements (nystagmus).
- Trouble speaking clearly.
- Drooping eyelids (ptosis).
- Hand tremors.
- Visual and tactile (touch-based) hallucinations.
- Impaired judgment.
- Impulsive (or even reckless) behavior.

### Stages of sleep deprivation

Total sleep deprivation, which is when you aren't getting any sleep, happens in stages. These stages are:

- **Stage 1**: This is when you go at least 24 hours without sleeping. In this stage, the effects of sleep deprivation are similar to being under the influence of alcohol to the point where it isn't safe for you to drive.

- **Stage 2**: Common symptoms of sleep deprivation intensify. Most people start to experience microsleeps in this stage and have trouble thinking or focusing.
- **Stage 3**: People in this stage start to show very severe symptoms like hallucinations. They may also struggle to communicate with people around them.
- **Stage 4**: The symptoms of sleep deprivation are at their most extreme. The above symptoms worsen to severe or extreme levels. Hallucinations are common and you struggle to tell what's real and what isn't.

## What causes sleep deprivation?

Sleep deprivation can happen for numerous reasons. Many of these have to do with the circumstances of your life.

- Shift work (especially shifts that happen partly or fully during nighttime hours).
- Alcohol use (especially misuse).
- Using stimulants like caffeine later in the day.
- Bad sleep-related habits (known as sleep hygiene).
- High stress levels.
- Sleeping in a new or unfamiliar place, such as in a hotel while traveling.

However, sleep deprivation can also happen for medical reasons. Some examples include:

- Lack of quality sleep due to sleep apnea.
- Degenerative brain disorders such as Alzheimer's disease or Parkinson's disease.
- Mental health concerns (see below for more about these).
- Concussions and traumatic brain injuries.
- Pain.
- Insomnia.
- Restless leg syndrome.
- Parasomnias (disruptive sleep disorders) such as night terrors, sleep paralysis, sleepwalking and more.
- Medications such as corticosteroids, stimulants and more.
- Short-term illnesses and infections, such as the common cold, the flu and more.

### Mental health concerns

Your mental health has a major impact on your sleep and vice versa. This can set up a cycle that reinforces itself as it gets worse. An example of this would be depression that makes it harder to sleep, which causes sleep deprivation, which then makes you feel even more depressed.

Mental health issues that can affect sleep include, but aren't limited to, the following:

- Anxiety.
- Bipolar disorder.
- Depression.
- Mania.
- Panic disorder.
- Post-traumatic stress disorder (PTSD).
- Somniphobia (fear of sleep).

## Is it contagious?

Sleep deprivation isn't contagious. You can't catch it from or spread it to others.

# Diagnosis and Tests

## How is sleep deprivation diagnosed?

A healthcare provider can usually diagnose sleep deprivation simply by asking you questions about your symptoms, health history and your daily and nightly routines. However, there are a few conditions where further tests are needed to determine if a related condition is contributing to or happening because of sleep deprivation. Some possible tests include:

- **Sleep apnea testing**. This can happen in the form of an overnight sleep lab study called a polysomnogram or with an at-home sleep apnea testing device.
- **Electroencephalogram (EEG)**. This test detects and records brain waves. Your healthcare provider, usually a neurologist, can examine your brain activity for signs of unusual brain activity that could contribute to sleep problems or other conditions.
- **Actigraphy**. This test involves wearing a device similar to a watch that tracks sleep patterns to see if you may have a different sleep cycle than is typical. This is key in diagnosing circadian rhythm disorders
- **Multiple sleep latency test (MSLT)**. This test examines whether a person is prone to falling asleep during the daytime. It's often a key part of diagnosing narcolepsy.
- **Maintenance of wakefulness test (MWT)**. This test looks for whether or not a person can resist falling asleep in situations where it would be easy to do so. It's a common part of safety testing for people who drive for a living and may have conditions like sleep apnea.

Other tests are also possible when sleep deprivation is something that your healthcare provider suspects. Your provider is the best person to tell you what tests they recommend and why they believe these tests are necessary.

## Management and Treatment

### How is it treated, and is there a cure?

Sleep deprivation can happen for many reasons, which means there's no one way to cure it. Depending on why it happens, it's often a treatable condition. However, treatment for sleep deprivation can take many different forms. Some treatment approaches focus on changing how a person sleeps (or prepares for sleep), while others focus on treating whatever disrupts a person's ability to sleep.

Some of the more common treatments for sleep deprivation and related conditions include:

- **Behavior changes**. Many people can prevent sleep deprivation simply by adjusting their sleep-related behaviors and pre-sleep routine.
- **Medications**. Various medications can help a person fall and stay asleep or change the way they sleep. Some medications can even change the way a person dreams, making it less likely that they'll have severe nightmares or other sleep disturbances. However, many sleep-inducing medications can be habit-forming, so healthcare providers prescribe these cautiously.
- **Breathing support methods**. Conditions that affect breathing during sleep, such as sleep apnea, are treatable with various methods. These include different types of pillows and supports, mouthpieces that adjust your jaw position, surgery to widen your airway, positive airway pressure machines that keep your airway open while you sleep and more.

#### Complications/side effects of the treatment

The possible complications and side effects vary depending on the treatment, the underlying cause of the sleep deprivation and other factors. Your healthcare provider is the best person to explain the complications or side effects that are possible or likely in your situation.

### How to take care of myself or manage the symptoms?

Sleep deprivation is a common issue, and often a person can manage it on their own. However, if the symptoms continue even with attempts to manage them on your own, you should talk to a healthcare provider. This is especially true if you have symptoms of sleep apnea, which is when you stop breathing in your sleep. That condition can cause severe or even life-threatening problems when it goes untreated.

The best things you can do to help treat and prevent sleep deprivation include:

- **Have a routine**. Being consistent with sleep habits can make a big difference in how much and how well you sleep.

- **Make the time for sleep**. Set a bedtime that allows you to get the recommended amount of sleep for your age.
- **Limit the time you spend around bright lights or using electronics**. Light from these too close to bedtime can disrupt your body's natural sleep-wake functions.
- **Avoid drinking alcohol or eating a meal too close to bedtime**. A light snack is the best option if you feel hungry before bedtime.
- **Physical activity can help**. Staying active, even just going for a walk, can help with the quality of your sleep.
- **Don't rely on sleeping medications**. Long-term use of sleeping pills and other medications — even ones that are available over-the-counter — can negatively affect your sleep. The only sleep-related medications you should use regularly are ones your healthcare provider prescribes, and you should only take them as instructed.

## How soon after treatment will I feel better?

The time it takes to recover from sleep deprivation depends on several factors, including how severe it is and how long it lasts. Most people can recover from sleep deprivation with only a few — or even just one — nights where they get enough quality sleep. However, some people may need several nights of quality sleep to recover from long-term sleep deprivation.

# Prevention

## How can I reduce my risk of developing sleep deprivation or prevent it entirely?

It's possible to reduce the risk of developing sleep deprivation, but it's virtually impossible to prevent it entirely. Because it can happen for so many reasons, many of which are normal and expected at some point in your life, everyone has some amount of sleep deprivation at some point.

To reduce the risk of having sleep deprivation, following the above recommendations on sleep hygiene, and ensuring you have enough time for an adequate amount of sleep can make a big difference. However, some causes of sleep deprivation are impossible to prevent or avoid, especially when it happens because of a medical condition.

In those instances, the best thing you can do is see your healthcare provider sooner rather than later. Early diagnosis and treatment, if necessary, can help minimize this issue's effects and prevent it from causing more serious problems.

## Outlook / Prognosis

### What can I expect if I have this condition?

If you have sleep deprivation, the most likely effect you'll notice is that you feel tired. As the amount of lost sleep increases, feeling tired becomes more noticeable and more severe symptoms will also appear. Eventually, people with severe sleep deprivation struggle to stay awake during the daytime, even while working.

As long as sleep deprivation continues, people with this issue will experience symptoms that can interfere with everyday routines and activities. There's evidence that long-term or severe sleep deprivation can cause brain damage. There's also ongoing research into whether or not a person can truly recover from sleep deprivation or if the effects are permanent. Currently, the available data suggests that it's reversible with adequate sleep.

It's also common for people with sleep deprivation to underestimate its impacts. Research shows that people with sleep deprivation often don't realize how much the problem affects their brain, body and abilities.

### How long does sleep deprivation last?

Sleep deprivation lasts as long as a person isn't getting enough sleep. This can be a single night or last for weeks, months or even years. If a person has sleep deprivation, they can recover by getting sufficient quality sleep. However, when sleep deprivation is severe or has lasted a long time, it can take multiple nights — or even up to a week — for a person to recover.

### What is the outlook for this condition?

The outlook for sleep deprivation can vary, especially depending on why it's happening, how severe it is and how long it lasts. It can also depend on your overall health, any other conditions you have and more. While sleep deprivation isn't usually dangerous directly, it can put you in danger if you are so tired that it interferes with tasks that need your full attention, such as driving.

Fortunately, sleep deprivation is usually a very treatable condition. However, it's important to discuss it with your healthcare provider if you notice it happening. While it's easy to dismiss it and think it's not a major problem, sleep deprivation can be an important clue that helps healthcare providers diagnose and treat an issue. It can also delay recovery from other conditions or make those conditions worse, so it's important to talk about it with your healthcare provider.

# Living With

## How do I take care of myself?

If you have sleep deprivation, it's important to work on improving your sleep. That includes getting enough sleep time-wise and ensuring that you're getting quality sleep. The above tips on sleep hygiene can help, and your healthcare provider can also offer support and guidance to assist you.

## When should I see my healthcare provider?

You should see your healthcare provider if you have sleep deprivation along with sleep apnea symptoms. You should also see them if you have sleep deprivation that doesn't get better, even with improvements in your sleep hygiene and habits.

### When should I go to ER?

Sleep deprivation isn't a condition that causes immediate, life-threatening problems, so it doesn't need emergency treatment. However, it can raise the risk of heart attack and stroke, both of which are emergency conditions that need immediate medical care.

### A note from Cleveland Clinic

Sleep deprivation is a condition that might seem minor, but it can have major negative effects on your activities and quality of life. It can also contribute to many other health conditions, some of which are dangerous over time.

If you have sleep deprivation, it's important not to dismiss or ignore it. You can take many steps to improve your sleep, and if those aren't successful, you should see your healthcare provider. They can determine whether or not you have sleep deprivation, how severe the issue is and why it's happening, and then offer treatment recommendations. With timely diagnosis and treatment, getting the sleep you need is possible.


Medically Reviewed

Last reviewed by a Cleveland Clinic medical professional on 08/11/2022.

Learn more about our editorial process.

- American Sleep Association | sleepassociation.org. Sleep deprivation stages & effects *(https://www.sleepassociation.org/sleep-resources/sleep-deprivation-stages-effects/)*. Accessed 8/11/2022.
- Centers for Disease Control and Prevention | cdc.gov. How much sleep do I need? *(https://www.cdc.gov/sleep/about_sleep/how_much_sleep.html)* Accessed 8/11/2022.
- Hanson JA, Huecker MR. Sleep Deprivation *(https://pubmed.ncbi.nlm.nih.gov/31613456/)*. 2022 Mar 7. In: *StatPearls* [Internet]. Treasure Island, FL: StatPearls Publishing; 2022 Jan-. Accessed 08/11/2022.
- Jawabri KH, Raja A. Physiology, Sleep Patterns *(https://pubmed.ncbi.nlm.nih.gov/31869144/)*. 2022 May 8. In: *StatPearls* [Internet]. Treasure Island, FL: StatPearls Publishing; 2022 Jan-. Accessed 08/11/2022.
- Scammell TE, Saper CB, Czeisler CA. Sleep Disorders. In: Loscalzo J, Fauci A, Kasper D, Hauser S, Longo D, Jameson J, eds. *Harrison's Principles of Internal Medicine*. 21st ed. McGraw Hill; 2022.
- Sleep and Its Abnormalities. In: Ropper AH, Samuels MA, Klein JP, Prasad S. eds. *Adams and Victor's Principles of Neurology*. 11th ed. McGraw Hill; 2019.
- Vital-Lopez FG, Doty TJ, Reifman J. Optimal sleep and work schedules to maximize alertness *(https://pubmed.ncbi.nlm.nih.gov/34106271/)*. *Sleep*. 2021;44(11):zsab144. Accessed 8/11/2022.
- Zamore Z, Veasey SC. Neural consequences of chronic sleep disruption *(https://pubmed.ncbi.nlm.nih.gov/35691776/)*. *Trends Neurosci*. 2022;S0166-2236(22)00101-1. Accessed 8/11/2022.

Cleveland Clinic is a non-profit academic medical center. Advertising on our site helps support our mission. We do not endorse non-Cleveland Clinic products or services. Policy

# EXHIBIT

# COVER PAGE



## Exhibit

Description of exhibit apa.org/news/press/releases/2023-/12/sleep-deprivation-anxious as accessed on 4/15/2024 by Stanford Health Library

Sleep deprivation makes us less happy, more anxious

Number of pages to this exhibit 2
Plus this page

# Sleep deprivation makes us less happy, more anxious

apa.org/news/press/releases/2023/12/sleep-deprivation-anxious



*People's emotional functioning suffers when their sleep is disrupted, study finds*

## Read the journal article – *Please see the included journal article.*

Sleep Loss and Emotion (PDF, 733KB)

Washington — Sleep loss does more than just make us tired. It can undermine our emotional functioning, decrease positive moods and put us at higher risk for anxiety symptoms, according to a study published by the American Psychological Association that synthesized more than 50 years of research on sleep deprivation and mood.

"In our largely sleep-deprived society, quantifying the effects of sleep loss on emotion is critical for promoting psychological health," said study lead author Cara Palmer, PhD, of Montana State University. "This study represents the most comprehensive synthesis of experimental sleep and emotion research to date, and provides strong evidence that periods of extended wakefulness, shortened sleep duration, and nighttime awakenings adversely influence human emotional functioning."

The study was published in the journal *Psychological Bulletin*.

Palmer and her colleagues, including co-lead author Joanne Bower, PhD, University of East Anglia, analyzed data from 154 studies spanning five decades, with 5,715 total participants. In all those studies, researchers disrupted participants' sleep for one or more nights. In some

experiments, participants were kept awake for an extended period. In others, they were allowed a shorter-than-typical amount of sleep, and in others they were periodically awakened throughout the night. Each study also measured at least one emotion-related variable after the sleep manipulation, such as participants' self-reported mood, their response to emotional stimuli, and measures of depression and anxiety symptoms.

Overall, the researchers found that all three types of sleep loss resulted in fewer positive emotions such as joy, happiness and contentment among participants, as well as increased anxiety symptoms such as a rapid heart rate and increased worrying.

"This occurred even after short periods of sleep loss, like staying up an hour or two later than usual or after losing just a few of hours of sleep," Palmer said. "We also found that sleep loss increased anxiety symptoms and blunted arousal in response to emotional stimuli."

Findings for symptoms of depression were smaller and less consistent, as were those for negative emotions such as sadness, worry and stress.

One limitation to the study is that the majority of participants were young adults—the average age was 23. Future research should include a more diverse age sample to better understand how sleep deprivation affects people at different ages, according to the researchers. Other directions for future research could include examining the effects of multiple nights of sleep loss, looking at individual differences to find out why some people may be more vulnerable than others to the effects of sleep loss, and examining the effects of sleep loss across different cultures, as most of the research in the current study was conducted in the United States and Europe, according to the researchers.

"Research has found that more than 30 percent of adults and up to 90 percent of teens don't get enough sleep," Palmer said. "The implications of this research for individual and public health are considerable in a largely sleep-deprived society. Industries and sectors prone to sleep loss, such as first responders, pilots and truck drivers, should develop and adopt policies that prioritize sleep to mitigate against the risks to daytime function and well-being."

**Article:** "Sleep Loss and Emotion: A Systematic Review and Meta-analysis of Over Fifty Years of Experimental Research," by Cara Alexis Palmer, PhD, Montana State University; Joanne L. Bower, PhD, University of East Anglia; Kit W. Cho, PhD, University of Houston Downtown; Michelle A. Clementi, PhD, University of Colorado—Anschutz Medical Campus; Simon Lau, PhD, and Candice A. Alfano, PhD, University of Houston; and Benjamin Oosterhoff, PhD, Meadows Mental Health Institute. *Psychological Bulletin*, published online Dec. 21, 2023.

**Cara Palmer** can be reached via email.